# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

CHRISTINE BENSE,             )
                                              )
        Plaintiff,           )
                                              )
V.                                   )       **Case No. 4:14CV890NCC**
                                              )
CAROLYN W. COLVIN,      )
**Acting Commissioner of Social Security,**)
                                            )
        Defendant.      )

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner denying the application of Christine Bense (Plaintiff) for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and for Supplemental Security Income (SSI), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). (Doc. 11). This matter is fully briefed and ready for disposition.[1]

---

[1] Plaintiff has filed a brief in support of the Complaint. (Doc. 25). Defendant has filed a brief in support of the Answer. (Doc. 30). Plaintiff has filed a Reply to Defendant's Brief in Support of the Answer (Reply). (Doc. 35). Also, Defendant has filed a Sur-Reply in Response to Plaintiff's Reply to Defendant's Brief in Support of the Answer. (Doc. 39).

# I.
## PROCEDURAL HISTORY

On November 6, 2006, Plaintiff filed applications for DIB and SSI, claiming a disability onset date of October 27, 2006. (Tr. 421, 1285-94).[2] After Plaintiff's applications were denied and she requested a hearing before an Administrative Law Judge (ALJ), ALJ Randolph Schum found Plaintiff not disabled within the meaning of the Act. (Tr. 421, 945-55). On November 10, 2008, Plaintiff filed second applications for DIB and SSI again alleging a disability onset date of October 27, 2006, (Tr. 421), and, on July 26, 2010, ALJ Victor Horton issued an unfavorable decision (Tr. 421, 927-44). While her administrative appeal of ALJ Horton's decision was pending, Plaintiff filed a third set of applications for benefits on September 17, 2010, in which she alleged a disability onset date of July 27, 2010, which she later amended to October 27, 2006. (Tr. 421-22).

Plaintiff appealed ALJ Horton's July 26, 2010 unfavorable decision to the Appeals Council, and the Appeals Council denied Plaintiff's request for review on November 25, 2011. (Tr. 421, 507-11). Plaintiff then filed a Complaint in the

---

[2] It is noted that the transcript in the instant matter is lengthy and has several sets of numbers identifying the transcript pages. One set of numbers, as is normally the case, appears in the lower right hand corner of each page; these numbers go to "2347." A second set appears only in the electronic version of the transcript and is located at the top right hand corner of each page; these numbers go to 2450. The parties in their briefs, and the administrative law judges (ALJs) who have considered this matter reference both sets of pages. In order to accurately address the parties' arguments and the relevant facts, the court has interchangeably referenced both sets of numbers.

United States District Court for the Eastern District of Missouri. (Tr. 421-22). By decision, dated March 19, 2013, the court reversed and remanded the matter pursuant to sentence four of 42 U.S.C. § 405(g). (Tr. 421-22, 512-44). See Bense v. Colvin, 4:12CV39LMB (E.D. Mo. Mar. 9, 2013). Upon implementing the court's decision, the Appeals Council ordered a new ALJ to follow the court's directives and issue a new decision on the associated claims. (Tr. 422, 544-51).

On October 28, 2013, ALJ J. Pappenfus held an administrative hearing on Plaintiff's applications. (Tr. 455-88). By decision dated January 21, 2014, ALJ Pappenfus issued an unfavorable opinion and found Plaintiff not disabled within the meaning of the Act.[3] (Tr. 417-448). In the matter under consideration, Plaintiff contends that the ALJ's January 21, 2014 decision is not based on substantial evidence. (Doc. 1).

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v.

---

[3] Unless otherwise stated, any references in this Memorandum and Order to the ALJ's decision are directed to the January 2014 decision of ALJ Pappenfus.

Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. See id.

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity (RFC). See

Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. See Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant]

could perform, given her RFC."). Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. See Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> The concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. See Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993);

Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. See Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. See Krogmeier, 294 F.3d at 1022. See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322.

The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. See id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. See Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him or her to reject the plaintiff's complaints. See Guilliams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he or she considered all of the evidence. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly

discuss each <u>Polaski</u> factor." <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1072 (8th Cir. 2004). <u>See also</u> <u>Steed</u>, 524 F.3d at 876 (citing <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. <u>See</u> <u>id.</u> Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. <u>See</u> <u>Rautio v. Bowen</u>, 862 F.2d 176, 179 (8th Cir. 1988); <u>Millbrook v. Heckler</u>, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. <u>See</u> <u>Karlix v. Barnhart</u>, 457 F.3d 742, 746 (8th Cir. 2006); <u>Nevland</u>, 204 F.3d at 857 (citing <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work. <u>See</u> <u>Goff</u>, 421 F.3d at 790; <u>Nevland</u>, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. <u>Warner v. Heckler</u>, 722 F.2d 428, 431 (8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that

can realistically be performed by someone with the plaintiff's qualifications and capabilities.  See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert (VE) may be used.  An ALJ posing a hypothetical to a VE is not required to include all of a plaintiff's limitations, but only those which the ALJ finds credible.  See Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180.  Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons.  See Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

### III.
### DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled.  See Onstead, 962 F.2d at 804.  Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position.  See Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

The ALJ found that Plaintiff met the insured status through December 31, 2011; that she had not engaged in substantial gainful activity, since her alleged

onset date of October 27, 2006; that Plaintiff had the severe impairments of peripheral neuropathy (alternatively diagnosed as lumbosacral radiculopathy) in the bilateral lower extremities, osteoarthritis of both knees, bipolar affective disorder, major depressive disorder, and generalized anxiety disorder; and that she did not have an impairment or combination of impairments that met or medically equaled a listed impairment. The ALJ found Plaintiff had the RFC to perform medium work with the following additional limitations:[4] Plaintiff could frequently stoop, kneel, crouch, and crawl; she had to avoid climbing ropes, ladders, and scaffolds; she had to avoid hazardous heights; and she could understand, remember, and carry out simple instructions and non-detailed tasks. After obtaining the testimony of a VE, the ALJ concluded that Plaintiff could perform her past relevant work as a wire worker, and, alternatively, that there were other jobs in the national economy which Plaintiff could perform. As such, the ALJ found Plaintiff not disabled within the meaning of the Act.

Plaintiff contends that the ALJ's January 21, 2014 decision is not based on substantial evidence for the following reasons: The ALJ failed to follow the remanding court's directive to evaluate the opinions of Plaintiff's treating

---

[4] 20 CFR § 416.967(c) defines medium work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."

psychiatrist, Sanjeev Kamat, M.D., under the proper standards; the ALJ failed to seek clarification from Dr. Kamat regarding conflicting opinions which he rendered regarding Plaintiff's limitations; the ALJ failed to properly evaluate the opinions of Jennifer Wessels, M.D., and Stephen Knapp, D.O., who were Plaintiff's treating physicians; the RFC which the ALJ included in the hypothetical she submitted to the VE differed from the RFC which the ALJ attributed to Plaintiff; and the ALJ's RFC determination is not supported by the medical evidence. (Doc. 25). Plaintiff also argues that the ALJ's evaluation limiting her to unskilled work does not adequately account for her moderate limitations in maintaining concentration, persistence, or pace. (Docs. 25 at 20, 36 at 8).[5] For the following reasons, the court finds that Plaintiff's arguments are without merit and that the ALJ's January 21, 2014 determination that Plaintiff is not disabled is based on substantial evidence and is consistent with the Regulations and case law.

A.    **Plaintiff's Credibility:**

The court will first consider the ALJ's credibility determination, as the ALJ's evaluation of Plaintiff's credibility was essential to the ALJ's determination of other issues.  See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was

---

[5] Although Defendant contends that Plaintiff raised this argument for the first time in her Reply, the court notes that Plaintiff actually raised this issue in her Brief in Support of Complaint.

influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010).  As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole; a court cannot substitute its judgment for that of the ALJ.  See Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882.

To the extent that the ALJ did not specifically cite Polaski, other case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence.  Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 895 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).  Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make.  See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is

recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).

In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered that Plaintiff had not undergone regular psychiatric treatment, primarily consisting of monthly appointments with her psychiatrist, throughout the period of disability. (Tr. 444). Nonetheless, the court notes that Plaintiff did see Dr. Kamat on an approximately monthly basis commencing in December 2006. (Tr. 520-29). To the extent the ALJ made such an error, the court finds reversal and remand are not appropriate due to this error given that this was just one of many factors upon which the ALJ relied when considering Plaintiff's credibility, and given that the record does not reflect that this error affected the outcome of Plaintiff's case. Welch v. Colvin, 765 F.3d 926, 929 (8th

Cir. 2014) (ALJ's failure to explicitly address the applicable regulation was an arguable deficiency in opinion writing that had no practical effect on decision because ALJ found Plaintiff's limitations had no more than a slight impact on claimant's ability to perform full range of sedentary work; therefore, the deficiency was not a sufficient reason to set aside ALJ's decision). See also Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008); Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) ("We have consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case.").

Second, the ALJ noted that Plaintiff was prescribed multiple medications and that her psychiatrist frequently adjusted her medication regimen, but that, generally, Plaintiff reported that her symptom improved with medication, as well as with the electro convulsive therapy (ECT). (Tr. 444). Conditions which can be controlled by treatment are not disabling. See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012); Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009). Additionally, the absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a plaintiff's complaints of disabling pain are credible. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) ("We [] think that it was reasonable for the ALJ to consider the fact that no medical

records during this time period mention [the claimant's] having side effects from any medication."); Richmond v. Shalala, 23 F.3d 1441, 1443-44 (8th Cir. 1994).

Indeed, on January 23, 2007, when Plaintiff reported that her medication had been stolen, Dr. Kamat restarted Plaintiff's medication. (Tr. 522). Dr. Kamat increased Plaintiff's Seroquel in January and February 2007, and in March 2007 discontinued other medications. Plaintiff was admitted to the hospital, in March 2007, when her husband called to report that she was not doing well, and, after her discharge, Plaintiff reported, on April 4, 2007, that she was taking her medications and that she was doing well. She also denied side effects from her medications. (Tr. 522). Dr. Kamat continued Plaintiff's medications, and, on May 2, 2007, Plaintiff denied feeling sad, depressed, or irritable although she reported difficulty sleeping. On May 30, 2007, Dr. Kamat increased Plaintiff's dosage of Depakote; on July 3, 2007, Dr. Kamat prescribed Ativan; on July 24, 2007, Dr. Kamat increased the dosage of Plaintiff's Depakote and Seroquel; on August 6, 2007, Plaintiff reported that she stopped taking Seroquel, but Dr. Kamat restarted her on that medication; on August 14, 2007, Plaintiff reported doing better and denied feeling as depressed as before; on September 18, 2007, Plaintiff reported that she was doing well on her medications without side effects; on October 30, 2007, when Plaintiff reported feeling depressed and having difficulty with concentration, Dr.

Kamat increased her Seroquel; and Dr. Kamat increased Plaintiff's medication again on November 16 and 30, and December 8, 2007. (Tr. 522-23).

When Plaintiff was admitted to the hospital in January 2008, her Global Assessment of Functioning (GAF)[6] was 15 to 20, but upon discharge, six days later, after being treated with medication, it was 70, indicating some mild symptoms. (Tr. 524). On January 28 and March 25, 2008, Plaintiff reported that she was doing well on her medications. The dosages of Plaintiff's medications were again increased by Dr. Kamat, on May 20, 2008, and adjusted, on June 17, 2008. On August 12, 2008, Plaintiff said her depression had decreased. From

---

[6] Global assessment of functioning (GAF) is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32. See also Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) ("[A] GAF score of 65 [or 70] . . . reflects 'some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships.'") (quoting Kohler v. Astrue, 546 F.3d 260, 263 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) (alterations in original). See also Goff, 421 F.3d at 791, 793 (affirming where court held GAF of 58 was inconsistent with doctor's opinion that claimant suffered from extreme limitations; GAF scores of 58-60 supported ALJ's limitation to simple, routine, repetitive work).

September 2008 to November 2008, Plaintiff's medications were adjusted, and then, on December 3, 2008, she reported to Dr. Kamat that she felt much better. (Tr. 525-26).

After Dr. Kamat adjusted Plaintiff's medications on April 21, 2009, Plaintiff reported on May 19, 2009, that her depression and irritability had decreased, but that she still experienced forgetfulness. (Tr. 527). After she had been managed with medication during a hospital stay from June 2 to 9, 2009, Plaintiff reported on June 24 and July 21, 2009, that she was feeling well with her current medications and was not depressed, anxious, or paranoid. (Tr. 528). Dr. Kamat adjusted Plaintiff's medications in September and October 2009, and, in November 2009, she reported doing okay. (Tr. 528). On December 15, 2009, Plaintiff told Dr. Kamat that she was feeling well and was not too sad, depressed, or anxious, and that she slept well at night.

When Plaintiff reported feeling a little anxious on January 11, 2010, her medications were adjusted. (Tr. 529). When Plaintiff was hospitalized, from February 27 to March 8, 2010, her medications were adjusted and Plaintiff denied any side effects. It was noted that Plaintiff "gradually" improved during the course of the hospitalization and became less anxious and denied suicidal ideation. On discharge her mood was better; her affect was less anxious, more engaged, and calmer; her insight and judgment were fair; and her memory was "overall intact."

Plaintiff's GAF on admission was 35 and on discharge it was 50. (Tr. 404-405, 409). Upon admission to the hospital, in September 2011, Plaintiff's GAF was 11 to 20, but upon discharge it was 70 to 75 (Tr. 1347, 1355); and, when Plaintiff's medications were adjusted during her November 2013 hospitalization, she improved (Tr. 924).

Third, the ALJ considered that Plaintiff had required a few psychiatric hospitalizations during the alleged period of disability, but that these hospitalizations were infrequent and were sometimes precipitated by noncompliance with prescribed medication. A lack of regular treatment for an alleged disabling condition detracts from a claimant's credibility. See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (upholding an ALJ's determination that claimant lacked credibility due in part to "absence of hospitalizations . . ., limited treatment of symptoms, [and] failure to diligently seek medical care"). Also, a claimant's noncompliance with prescribed treatment is a basis upon which an ALJ may discredit the claimant. Wildman v. Astrue, 596 F.3d 959, 968-69 (8th Cir. 2010) (it is permissible for ALJ to consider claimant's noncompliance with prescribed medical treatment; distinguishing Pate–Fires v. Astrue, 564 F.3d 935 (8th Cir. 2009), on the basis that there was "no evidence expressly linking [the claimant's] mental limitations to such repeated noncompliance," and there was

conflicting evidence regarding the claimant's alleged memory and concentration impairments).

Notably, Plaintiff was briefly hospitalized in February 2007; she was hospitalized from January 9 to January 15, 2008, and from June 2 to June 9, 2009; and she was briefly hospitalized in late February 2010, in early March 2010, in September 2010, in September 2011, and in November 2013. (Tr. 283, 343, 349, 433, 527, 529, 983, 1445, 1979). Further, when Plaintiff was hospitalized in January 2008, it was after she was noncompliant with her medications (Tr. 2016), and, when she presented to the emergency room in June 2009, Plaintiff indicated she had been taking her medications incorrectly. (Tr. 1946).

Fourth, the ALJ considered inconsistencies in Plaintiff's testimony. (Tr. 445). See Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007) ("An ALJ may not disregard subjective complaints merely because there is no evidence to support the complaints, but may disbelieve subjective reports because of inherent inconsistencies or other circumstances.") (internal quotation and citation omitted). In particular, the ALJ considered that Plaintiff testified at the 2013 hearing that she had not gone grocery shopping since 2006, but, at the February 2010 hearing, Plaintiff testified that she grocery shopped with her ex-husband and also reported grocery shopping in April 2010. In September 2010, Plaintiff said she never prepared meals because of her mental impairments, but earlier that year she

reported that she prepared meals regularly. (Tr. 445). The court notes that, at the 2013 hearing, the ALJ asked Plaintiff if she had been through "detox or rehab," and Plaintiff responded that she had been in the "hospital to straighten out [her] psych medicine, but other than that, . . . that[] [was] the only time." (Tr. 468). Later at the hearing, the ALJ repeated the question, adding that the record reflected that there were "two attempts of drinking as well as taking pills; excessive drinking." The ALJ then asked Plaintiff "how many times [she] had been through detox or rehab, . . . for either alcohol, drugs, or both." Plaintiff repeated that she had been in the hospital to straighten out her medication twice. When the ALJ pointed out that the medical records reflected that she had been hospitalized at least twice for alcohol abuse, Plaintiff responded, "[t]hat[] [was] when I went in a mental institution." (Tr. 470-71). The ALJ noted that Plaintiff "finally admitted" that she had at least two admissions for alcohol abuse; that, earlier at the hearing, when questioned about her prior jobs, Plaintiff could not remember what she did for work[7]; that even though Plaintiff could not remember what she had done for work, she could tell the ALJ, "in detail, who it [was] [she had] been treating with," which was "irregular"; and that Plaintiff's inconsistent testimony reflected poorly on her credibility. (Tr. 471).

---

[7] When the ALJ asked Plaintiff what she did when she worked at Gourmet Systems, Plaintiff said she could not remember. When asked what she did at Showland Limited, she said she did not know about that, either.

Fifth, as considered by the ALJ, Plaintiff received unemployment compensation during a period when she was seeking disability benefits, generally between November 18, 2006, and October 10, 2007. (Tr. 445). Notably, Plaintiff testified that, while receiving benefits, she may have looked for waitress work, although she did not look for jobs while she was sick or had a broken foot. (Tr. 465-66). See Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991) (finding claimant's application for unemployment benefits adversely affected his credibility; "[a] claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold himself out as available, willing and able to work.").

Sixth, the ALJ considered Plaintiff's daily activities, including that she reported that she prepared simple meals; that she testified, at the 2010 hearing, that she cooked full meals; that she reported that she did laundry, dishes, and other household chores; that she had a driver's license but stated that she did not drive; that she reported grocery shopping with her ex-husband and walked her dog in the park; and that she testified, at the 2010 hearing, that she visited her children in other cities for a week and went to restaurants with family members. (Tr. 445, 516-18). Additionally, Plaintiff told Timothy Leonberger, Ph.D., a consultative examiner, that she was capable of doing laundry, housework, and fixing simple meals; that she went shopping with her ex-husband; that she liked to take her dog

to the park; that she talked with her mother "on the average of twice a week"; and that she and her ex-husband occasionally went to dinner.  (Tr. 1924).

While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, a claimant's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints.  <u>See</u> <u>McDade v. Astrue</u>, 720 F.3d 994, 998 (8th Cir. 2013) (ALJ properly discounted plaintiff's credibility where, among other factors, plaintiff "was not unduly restricted in his daily activities, which include the ability to perform some cooking, tak[ing] care of his dogs, us[ing] a computer, driv[ing] with a neck brace, and shop[ping] for groceries with the use of an electric cart"); <u>Eichelberger</u>, 390 F.3d at 590 (ALJ properly considered that plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1038 (8th Cir. 2001).  Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations."  <u>Davis v. Apfel</u>, 239 F.3d 962, 967 (8th Cir. 2001).  "Inconsistencies between [a claimant's] subjective complaints and [her] activities diminish [her] credibility."  <u>Goff</u>, 421 F.3d at 792.  <u>See also</u> <u>Haley v. Massanari</u>, 258 F.3d 742, 748 (8th Cir. 2001); <u>Nguyen v. Chater</u>, 75 F.3d 429, 439-41 (8th Cir. 1996) (holding that a claimant's

daily activities, including visiting neighbors, cooking, doing laundry, and attending church, were incompatible with disabling pain and affirming denial of benefits at the second step of analysis).

**B.    Dr. Kamat's Opinion:**

Dr. Kamat, who was Plaintiff's treating psychiatrist, completed six (6) Mental Medical Source Statements from 2007 to 2013.   In some of these Statements, dated March 6, 2007 (Tr. 2167-70),[8] March 19, 2008 (Tr. 2163-66),[9] February 24, 2009 (Tr. 393-96),[10] November 10, 2009 (Tr. 402-405),[11] August 31,

---

[8]   In the March 2007 Mental Medical Source Statement, Dr. Kamat imposed no extreme limitations and opined that Plaintiff had mild limitations only in the area of maintaining reliability.  He opined that Plaintiff had moderate limitations in the areas of relating in social situations, interacting with the general public, understanding and remembering simple instructions, and making simple work-related decisions.   In all other areas, he opined that Plaintiff had marked limitations, and he opined that Plaintiff had a substantial loss of ability to perform all basic mental activity necessary to work in regular competitive employment.

[9]   In the March 2008 Mental Medical Source Statement, Dr. Kamat imposed no extreme limitations and found marked limitations in the ability to cope with normal work stress, behave in an emotionally stable manner, relate in social situations, accept instructions and respond to criticism, complete a normal workday, maintain attention and concentration for extended periods, perform at a consistent pace, and respond to changes in a work setting.  In all other areas, he found moderate or no limitations.  He also opined that Plaintiff could understand, remember, and carry out simple instructions.

[10]   In the February 2009 Mental Medical Source Statement, Dr. Kamat imposed no extreme limitations and found marked limitations only in the areas of interacting with strangers or the general public, maintaining attention and concentration for extended periods, and responding to changes in work settings.  He also found

2011 (Tr. 1806-1809),[12] and June 21, 2013 (Tr. 846-49),[13] Dr. Kamat opined that Plaintiff had marked limitations in many areas of functioning and extreme limitations in some areas of functioning, and, in several of the Mental Medical Source Statements, he opined that Plaintiff would miss work three or more times per month and be late three or more times per month. For numerous reasons, the ALJ stated that he gave little weight to Dr. Kamat's opinion regarding the extent of Plaintiff's functional limitations. (Tr. 439-41).

---

Plaintiff could interact appropriately with supervisors six hours a day, although she was limited to four hours a day in regard to other areas of sustained performance.

[11] In the November 2009 Mental Medical Source Statement, Dr. Kamat imposed no marked or extreme limitations in any area other than Plaintiff's ability to maintain attention and concentration for extended periods. In all other areas, Plaintiff had moderate or no limitations. He also opined that Plaintiff could interact with the public and carry out simple instructions six hours a day.

[12] In the August 2011 Mental Medical Source Statement, Dr. Kamat opined that Plaintiff had an extreme limitation only in the area of accepting instructions or responding to criticism and that she had marked limitations in regard to behaving in an emotionally stable manner, responding to changes in work settings, performing at a consistent pace, and maintaining attention and concentration for extended periods. In all other areas, Dr. Kamat opined that Plaintiff had either moderate or no limitations. He also opined, in all areas specified, that Plaintiff could sustain regular performance at a given level of functioning for four hours a day.

[13] In the June 2013 Mental Medical Source Statement, Dr. Kamat imposed extreme limitations in Plaintiff's ability to function independently, behave in an emotionally stable manner, and relate to family, peers, and caregivers. He also opined that she could not sustain performance at the level of functioning in the designated areas relating to coworkers and supervisors five days a week, eight hours a day, with three scheduled breaks; that she could focus for only one hour; and that she would be absent three times a month.

Plaintiff contends that the ALJ gave improper weight to Dr. Kamat's opinions and that the ALJ should have recontacted Dr. Kamat. It should be noted that the record before the court, upon its ordering reversal and remand, included records only through May 2010, and, in her Brief in Support of Complaint, in the matter currently before the court, Plaintiff does not specifically reference Plaintiff's treatment records to support her arguments; rather, Plaintiff references only the Mental Medical Source Statements completed by Dr. Kamat and evaluations of other medical sources. (Doc. 25). Nonetheless, the court has conducted an extensive review of the complete record, and, for the following reasons, finds that Plaintiff's arguments regarding the ALJ's consideration of Dr. Kamat's opinions are without merit and that the ALJ gave proper weight to Dr. Kamat's opinions.

First, as considered by the ALJ, the extreme limitations which Dr. Kamat opined Plaintiff had in the Mental Medical Source Statements were inconsistent with Dr. Kamat's own treatment notes. (Tr. 439). See Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (ALJ properly discounted treating doctor's opinions where opinions were inconsistent); Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's

opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence"). In particular, the ALJ considered that clinical findings from Dr. Kamat's mental status examinations of Plaintiff demonstrated that she had fair eye contact, fair grooming, and fair insight and judgment; that Plaintiff exhibited appropriate behavior, normal speech, normal psychomotor activity, and linear, logical thought processes; and that these repeated and consistent objective findings were inconsistent with the degree of limitations set forth in Dr. Kamat's opinions. (Tr. 439-40).

Notably, in December 2006, pursuant to a mental status examination, Dr. Kamat reported that Plaintiff's thought process was logical, her insight and judgment were fair, and she had no homicidal or suicidal ideation. (Tr. 177-78, 520-21). On January 23, 2007, Dr. Kamat reported that Plaintiff was cooperative; her thought process was logical; she was oriented; and she had no delusions or paranoia. (Tr. 280). On April 4, 2007, Dr. Kamat reported, pursuant to a mental status examination, that Plaintiff was cooperative; her affect was fair; her thought process was logical; she had no delusions or paranoia; she was alert and oriented; and her insight and judgment were fair. (Tr. 284). On May 2, 2007, Dr. Kamat reported that Plaintiff's eye contact and grooming were fair; she was cooperative and coherent; she had no abnormal motor activity; her behavior was appropriate;

Plaintiff's mood was congruent; her affect was euthymic; Plaintiff's thought process was linear and logical; she had no flight of ideas or looseness of association; Plaintiff had no delusions, paranoid ideas or suicidal ideation; and her insight was fair. (Tr. 285). On May 30, 2007, pursuant to a mental status examination, Dr. Kamat reported that Plaintiff was oriented and cooperative and had fair eye contact and grooming, normal speech, congruent mood, and a linear and logical thought process. (Tr. 286). On July 3, 2007, pursuant to a mental status examination, Dr. Kamat reported that Plaintiff was oriented, had fair eye contact, was cooperative, and had coherent speech; her thought process was linear and logical; and she had fair insight and judgment. (Tr. 287).

On February 25, 2008, Plaintiff was cooperative and coherent and had fair eye contact, grooming, and insight, appropriate behavior, good judgment, and a linear thought process. (Tr. 291). On May 20, 2008, Dr. Kamat reported that Plaintiff was oriented, cooperative, and coherent; that her thought process was linear and logical; and that her insight and judgment were fair. (Tr. 293). On June 17, 2008, Dr. Kamat reported that Plaintiff was oriented; she had fair eye contact, insight, and judgment; she was cooperative; her speech was coherent and spontaneous; her behavior was appropriate; her mood was congruent; and her thought process was linear and logical. (Tr. 301). On August 12, 2008, Dr. Kamat reported that Plaintiff was oriented and cooperative and had appropriate behavior,

spontaneous and coherent speech, normal motor activity, congruent mood, and a logical and linear thought process. (Tr. 303). On October 7, 2008, pursuant to a mental status examination, Dr. Kamat reported that Plaintiff was oriented and had fair eye contact, insight and judgment, appropriate behavior, normal motor activity, spontaneous and coherent speech, and congruent mood. (Tr. 305).

On June 24, August 18, September 25, October 13, and November 10, 2009, pursuant to mental status examinations, Dr. Kamat reported that: Plaintiff was oriented and had fair eye contract, insight, and judgment; her behavior was appropriate; her speech was spontaneous; her mood was congruent; and her thought process was linear and logical. (Tr. 337, 339-41, 390). On December 15, 2009, pursuant to a mental status examination, Dr. Kamat reported that: Plaintiff was oriented; she had fair eye contact, insight, and judgment; she had normal motor activity; her speech was spontaneous and coherent; her behavior was appropriate; her affect was bright; and her thought process was linear and logical, with no flight of ideas, looseness of association, or tangentially. (Tr. 389).

Pursuant to mental status examinations, on February 12, March 9, April 6, May 4, and June 1 and 29, 2010, Dr. Kamat reported that Plaintiff was alert and oriented and had fair grooming and eye contact, no abnormal motor activity, appropriate behavior, and coherent and spontaneous speech. On these dates, Plaintiff's affect was reactive; her mood was congruent; her thought process was

logical and linear; she had no flight of ideas or tangentially; she had no delusions, paranoid ideas, or hallucinations; and her insight and judgment were fair. (Tr. 1321-26).

Dr. Kamat's findings remained generally the same every month for the rest of 2010 and through September 2011. (Tr. 1332-41). Again, in January 2012, Dr. Kamat reported that Plaintiff was alert and oriented, had fair eye contact, was cooperative, and had fair grooming, no abnormal motor activity, a reactive affect, appropriate behavior, coherent speech, a logical and linear thought process, and fair insight and judgment. Plaintiff had no flight of ideas, looseness of association, delusions, paranoid ideas, or suicidal ideation. (Tr. 1342). Also, Dr. Kamat's findings generally continued to be the same in March and April 2012 (Tr. 1343-44), in May through August 2012 (Tr. 898-991), October and November 2012 (Tr. 902-903), January through May 2013 (Tr. 904-908), and August through October 2013 (909-911).

Pursuant to a mental status examination when Plaintiff was admitted to the hospital on November 1, 2013, Dr. Kamat reported that Plaintiff's thought process was logical and goal directed; that paranoia and delusions were not present; that Plaintiff had no auditory or visual hallucinations; that Plaintiff was oriented and alert; that her intelligence was average; that her memory was fair; and that her insight was limited and her judgment was poor. (Tr. 914). Thus, the court finds

that the ALJ's determination that the extreme limitations which Dr. Kamat assigned to Plaintiff in the six Mental Medical Source Statements were inconsistent with Dr. Kamat's own treatment notes is based on substantial evidence.

Second, as discussed above in regard to Plaintiff's credibility and as considered by the ALJ, Dr. Kamat's records frequently reflected that Plaintiff was doing well or better with medication adjustments and compliance. (Tr. 284-85, 290, 291-92, 294, 298-99, 303, 390). Also, as discussed above, and as considered by the ALJ, while hospitalized and receiving treatment from Dr. Kamat, Plaintiff's GAF improved. In fact, in January 2008, her GAF went from 15-20 to 70 while she was hospitalized. (Tr. 440). See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling).

Third, as discussed above in regard to Plaintiff's credibility, when Dr. Kamat admitted Plaintiff to the hospital, her hospitalizations were brief. (Tr. 248, 300, 351-52, 2244).

Fourth, as considered by the ALJ, the extreme limitations which Dr. Kamat opined Plaintiff had in the Mental Medical Source Statements were inconsistent with what Plaintiff told Dr. Kamat. (Tr. 440). Notably, on April 4, 2007, Plaintiff told Dr. Kamat she was taking her medications and that she was doing "very well," and she denied feeling depressed. (Tr. 284). In August 2007, Plaintiff reported to

Dr. Kamat that she was doing better and denied feeling as depressed as before. (Tr. 290). In September 2007, Plaintiff told Dr. Kamat that she was doing well on her medications and had no side effects. (Tr. 294). In August 2008, Plaintiff reported some anxiety and trouble sleeping at night, but also indicated that her depression had decreased. (Tr. 303). In December 2008, Plaintiff told Dr. Kamat she felt much better. (Tr. 308). In May 2009, Plaintiff reported that her depression and irritability had decreased, although she still experienced forgetfulness. (Tr. 346). In November 2009, Plaintiff reported that she was doing okay. (Tr. 390). In December 2009, Plaintiff told Dr. Kamat she was feeling well and was sleeping well at night. (Tr. 389). Further, when Plaintiff underwent ECT, she reported to Dr. Kamat that her mood had improved. (Tr. 1456-59, 1499, 1502, 1507, 1512, 1522, 1525, 1530, 1537, 1540, 1549, 1554, 1557, 1571, 1574, 1578, 1583, 1591, 1595, 1600). Cf. Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013) (treating doctor's opinion not given controlling weight where it is internally inconsistent or inconsistent with claimant's own testimony).

Fifth, although Dr. Kamat opined that Plaintiff had marked or extreme limitations in many areas, his treatment notes relevant to these areas do not reflect objective findings to support such limitations. See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate the need to evaluate the record as whole and

upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation). To the extent Dr. Kamat opined that Plaintiff had marked difficulties in maintaining socially acceptable behavior, behaving in an emotionally stable manner, accepting instructions and responding to criticism, and working in coordination with others, as discussed above, Dr. Kamat repeatedly reported that Plaintiff was cooperative and that her behavior was appropriate. To the extent Dr. Kamat opined that Plaintiff would have marked difficulties in completing a normal workday without interruptions from symptoms, as discussed above, Dr. Kamat repeatedly reported that Plaintiff's mood was congruent and linear. To the extent Dr. Kamat opined that Plaintiff had a substantial loss in the ability to understand, remember, and carry out simple instructions, as discussed above, he repeatedly reported that her thought process was logical, her insight and judgment were fair, she was alert and oriented, she had good eye contact, and she had no flight of ideas.

Sixth, the ALJ considered that Dr. Kamat's opinion that Plaintiff had marked and even extreme limitations with regard to many aspects of basic mental work activities was inconsistent with the GAF scores which Dr. Kamat assigned to Plaintiff during the course of her treatment. (Tr. 440). See Wildman, 596 F.3d at 964; Hacker, 459 F.3d at 937. For example, on December 27, 2006, Dr. Kamat

reported that Plaintiff had a GAF of 55 to 65, which was consistent with moderate symptoms rather than marked or extreme limitations (Tr. 521), and, on June 25, 2009, Dr. Kamat reported that Plaintiff had a GAF of 70, indicating she had mild symptoms. (Tr. 1821).

Seventh, the ALJ gave less weight to Dr. Kamat's opinion as expressed in the Mental Medical Source Statements because they were internally inconsistent. (Tr. 440). An ALJ may "discount or even disregard the opinion of a treating physician where . . . [the] treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). See also Romine v. Colvin, Slip Op. 14-1253, 8th Circuit, April 28, 2015, at 11, 13 (finding ALJ properly gave more weight to opinion of consulting physician because of inconsistencies in treating doctor's opinions); Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011) ("[W]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight.") (internal quotation marks and citation omitted); Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010) ("The ALJ noted the conflicting opinions regarding [the claimant's] ability to perform work activities and chose not to give controlling weight to [the treating psychiatrist's] opinion."). In this regard, although Dr. Kamat opined in March 2007 that Plaintiff had a substantial loss in her ability to understand, remember, and carry out simple

instructions, he opined one year later, in March 2008, that Plaintiff had no limitations in her ability to understand and remember simple instructions. (Tr. 2163-70). Although Dr. Kamat opined in March 2008 that Plaintiff had no limitations in interacting with the general public, less than a year later, in February 2009, he opined that Plaintiff had marked limitations in this area. (Tr. 440, 1963, 2064).

Eighth, the ALJ considered that Dr. Kamat imposed greater functional limitations for Plaintiff than she alleged. (Tr. 440). Cf. Whitman v. Colvin, 762 F.3d 701, 706 (8th Cir. 2014) (discounting doctor's opinion because his opinion was "more restrictive than [the claimant's] self-reported activities"). For example, Dr. Kamat opined that Plaintiff was extremely limited in her ability to behave in an emotionally stable manner and to interact appropriately with her family and peers, and that she could not perform for supervisors without exhibiting insubordinate behavior (Tr. 779), but Plaintiff reported having good relationships with her mother and ex-husband and did not report having problems getting along with others, including authority figures (Tr. 169, 174-75, 398, 440, 730, 735-36, 2319, 2324-25).

Ninth, as considered by the ALJ, Dr. Kamat's opinions as expressed in the Mental Medical Source Statements were inconsistent with the findings of Dr. Leonberger, a consultative examiner, who saw Plaintiff on April 7, 2010. (Tr.

440). Indeed, an ALJ may give more weight to the opinion of a consultative examiner than to the opinion of a treating doctor where there are inconsistencies in the treating doctor's opinion. See Romine, Slip Op. 14-1253 at 11, 13 (consulting physician's opinion was not "tainted with the apparent inconsistences of [the treating doctor's] assessment") (citing Anderson v. Barnhart, 344 F.3d 809, 812 (8th Cir. 2003). As discussed above, there were numerous inconsistencies between Dr. Kamat's treatment notes and his opinions, and his opinions themselves were inconsistent with one another. Notably, upon examining Plaintiff, Dr. Leonberger reported that she was alert and oriented; her hygiene and grooming "appeared to be good"; her speech was "soft in tone but otherwise normal in rate, rhythm, articulation, and fluency"; her thinking was logical and sequential with no evidence of thought disorder; her mood "appeared depressed and somewhat anxious and her affect was withdrawn, nervous and shy"; her attention/concentration "was generally adequate for the tasks that were presented to her"; her insight appeared to be fair; and no unusual testing behaviors were noted.

Most significantly, Dr. Leonberger reported that testing of Plaintiff's intelligence showed that she had a full scale IQ of 74, which was in the borderline range; additional testing showed that Plaintiff's immediate memory was in the low average range, her general memory was in the average range, and her working

memory was in the low average range. (Tr. 1925). Dr. Leonberger opined that Plaintiff "over-report[ed] [her] psychological symptoms," noting that "[h]er level of endorsing psychiatric symptoms was higher than even the most disturbed individuals with genuine psychopathy." Dr. Leonberger further opined that Plaintiff had a "reasonably clear history of depression," but given that "very few if any symptoms of a manic episode were reported," he was "uncertain as to how [Plaintiff] got the diagnosis of Bipolar Disorder." (Tr. 1927). As for Plaintiff's functional limitations, Dr. Leonberger opined that Plaintiff had moderate limitations in activities of daily living. In the area of social functioning, Dr. Leonberger noted that Plaintiff appeared to be socially withdrawn, but that she did maintain contact with her mother and ex-husband; thus, Dr. Leonberger opined, in this area, that Plaintiff had a moderate impairment. In regard to concentration, persistence and pace, Dr. Leonberger opined that Plaintiff had moderate limitations based on her attention/concentration and memory averaging in the borderline to low average range and considering that her depression affected this area. Dr. Leonberger opined that Plaintiff had a moderate limitation in deterioration or decompensation in work or work-like settings, and that, considering her psychiatric diagnoses, she "may be capable of returning to work as a cashier or doing light factory work." (Tr. 1027-28). Thus, Dr. Leonberger's opinion was based on objective testing of Plaintiff and a thorough mental status examination. See Tilley

v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (doctor's opinion afforded controlling weight where it is well-supported by medically acceptable clinical testing and not inconsistent with the claimant's records). Moreover, Dr. Leonberger gave good reasons for his findings and his findings were based on medically acceptable clinical data. See Grebenick v. Chater, 121 F.3d 1193 (8th Cir. 1997); Heino v. Astrue, 578 F.3d 873, 880 (8th Cir. 2009) ("An ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence."). As such, to the extent that the ALJ gave more weight to Dr. Leonberger's opinion than to Dr. Kamat's opinions, the court finds that the ALJ's decision is based on substantial evidence.

Tenth, as considered by the ALJ, Dr. Kamat expressed his opinion by merely checking boxes on a form; he did not provide explanations for the limitations he imposed on Plaintiff. (Tr. 441). Notably, a treating physician's checkmarks on a form are conclusory opinions which can be discounted if contradicted by other objective medical evidence. Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan, 239 F.3d at 961; Social Security Ruling (SSR) 96-2p, 1996 WL 374188 (July 2, 1996).

Eleventh, to the extent Plaintiff contends the ALJ did not consider many of the relevant factors for weighing medical opinions as set forth in the Regulations, (Doc. 25 at 18-19), an ALJ is not required to explicitly discuss every factor

mentioned in 20 C.F.R. §§ 404.1527(c)(2)-(5) and 416.927(c)(2)-(5), and failure to discuss each factor does not mean the ALJ did not consider them.  See Molnar v. Colvin, 2013 WL 3929645, at *2 (E.D. Mo. July 29, 2013).  In any case, the ALJ did consider some of the factors which Plaintiff alleges she failed to consider.  For example, although Plaintiff argues that the ALJ did not consider the length of time Dr. Kamat treated Plaintiff, the extent of his relationship with Plaintiff, or the frequency of examination, the ALJ specifically considered that Dr. Kamat saw Plaintiff basically on a monthly basis since her alleged onset date, that Dr. Kamat was a treating doctor, and that ordinarily his opinion would be afforded substantial or controlling weight.  (Tr. 433, 439).

Twelfth, the ALJ considered that Dr. Kamat's opinions as expressed in the Mental Medical Source Statements did not contain any explanations or references to specific medical evidence "other than reiteration of [Plaintiff's] diagnosis of bipolar disorder and generalized anxiety disorder[] to support the assessed limitations."  (Tr. 441).  Indeed, a treating doctor's opinion need not be afforded controlling weight where it consists of conclusory statements.  Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010).

Thirteenth, upon considering the weight to be given Dr. Kamat's opinion, the ALJ was fulfilling her role to evaluate the record as a whole.  See Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) ("Although a treating physician's opinion

is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole.").

Fourteenth, the ALJ provided good reasons for not giving Dr. Kamat's opinions controlling weight. 20 C.F.R. §§ 404.1527 and 416.927 (requiring that an ALJ provide "good reasons . . . for the weight given to a treating source's medical opinion(s)"). See also Martise v. Astrue, 641 F.3d 909 (8th Cir. 2010).

Fifteenth, the ALJ did give some weight to Dr. Kamat's opinion as, consistent with Dr. Kamat's opinions in the March 2008 and November 2009 Mental Medical Source Statements, the ALJ limited Plaintiff to understanding, remembering, and carrying out simple instructions and non-detailed tasks. See Choate v. Barnhart, 457 F.3d 865, 869-70 (8th Cir. 2006) (holding that the limitations imposed by the ALJ as reflected in the claimant's RFC demonstrated that the ALJ gave some credit to the opinions of the treating physicians); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("In assessing [the claimant's] RFC, the ALJ determined that [the claimant] could sit for a total of six hours and stand for a total of two hours, but was limited to sedentary work. This in itself is a significant limitation, which reveals that the ALJ did give some credit to [the treating doctor's] medical opinions.").

Sixteenth, to the extent Dr. Kamat opined in the June 2013 Mental Medical Source Statement that Plaintiff's overall pace of production in a low-stress work

environment would be thirty-one percent or more below average (Tr. 846-49), the ALJ noted that "this assessed limitation [was] speculative," and that this assessment was "partially vocational in nature, and thus exceed[ed] the scope of Dr. Kamat's medical knowledge": "it assume[d] knowledge of what 'average' pace of production would be in an undefined and unspecified workplace." (Tr. 441). Cf. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ need not defer to treating doctor's opinion that claimant is totally disabled "because it invades the province of the Commissioner to make the ultimate disability determination").

Seventeenth, the ALJ considered that Dr. Kamat failed to respond to the correspondence of ALJ Schum for purposes of clarifying aspects of Dr. Kamat's opinions. (Tr. 441, 954, 1040-41).

Finally, the court will consider Plaintiff's argument that the ALJ failed to seek clarification from Dr. Kamat regarding the inconsistencies in his opinions, as ordered by this court. (Doc. 25 at 19). First, this court simply noted that the prior ALJ failed to support his findings that Dr. Kamat relied on Plaintiff's subjective complaints and noted that ALJ should have sought clarification from Dr. Kamat regarding whether he based his opinions upon Plaintiff's subjective complaints. (Tr. 540). Notably, upon remand, the ALJ who authored the decision which is the subject of the matter under consideration did not discredit Dr. Kamat's opinion because it was based on Plaintiff's subjective complaints. (Tr. 439-40). As such,

there was no reason for the ALJ to seek further clarification from Dr. Kamat. In any case, given that ALJ Schum sought clarification from Dr. Kamat in July 2008 and Dr. Kamat failed to respond, it is likely that any attempt by the ALJ to contact Dr. Kamat would have been futile. (Tr. 441, 954, 1040-41). Most significantly, the issue before this court is whether the ALJ's decision, as it currently stands, is based on substantial evidence.

Further, the court finds that, even if the current ALJ should have sought clarification from Dr. Kamat, the ALJ's failure to do so does not affect the outcome of this matter, as the record included medical evidence provided by Plaintiff as well as reports from a consultative psychological examiner and several State agency psychologists who reviewed the record. See Welch v. Colvin, 765 F.3d 926, 929 (8th Cir. 2014) (ALJ's failure to explicitly address applicable SSR 96-9p was an arguable deficiency in opinion writing that had no practical effect on decision because the ALJ found Plaintiff's limitations had no more than a slight impact on claimant's ability to perform full range of sedentary work); Johnson v. Astrue, 424 F. App'x. 592, 594-95 (8th Cir. 2011) (per curiam) (unpublished) (district court instructed, upon remand, that the ALJ ask doctor to evaluate claimant's ability to function in the workplace given her fibromyalgia-related symptoms, and ALJ failed to do so; holding any error attributable to ALJ's failure

to personally contact doctor upon remand was harmless as ALJ obtained medical testimony regarding claimant's ability to function).

In conclusion, the court finds that the ALJ gave proper weight to Dr. Kamat's opinions and that the ALJ's decision, in that regard, is based on substantial evidence and consistent with the Regulations and case law.

**C.    Opinion of Dr. Knapp:**

Dr. Knapp saw Plaintiff for her physical impairments. (Tr. 442, 782-801, 1223-24, 1253-74). Nonetheless, Dr. Knapp completed a questionnaire, in January 2011, in which he stated, in response to a question asking his opinion regarding Plaintiff's ability to perform and sustain work-related functions, that Plaintiff's "psych disability may be altering her work/functional capacity. Physically she is capable of working." (Tr. 1773). The ALJ stated that he gave little weight to Dr. Knapp's opinion in evaluating Plaintiff's RFC. (Tr. 433). Plaintiff simply states that the ALJ failed to give proper weight to the opinion of Dr. Knapp for the same reasons the "ALJ erred in evaluating the opinions of Dr. Kamat" and that the ALJ failed to evaluate the length of treatment, frequency of examination, and nature and extent of Dr. Knapp's treatment relationship with Plaintiff. (Doc. 25 at 20).

Despite Plaintiff's suggesting that the ALJ failed to give proper weight to Dr. Knapp's opinion regarding Plaintiff's mental limitations, Dr. Knapp was Plaintiff's treating primary care physician; he was not a mental health professional.

"Although a treating physician's opinion is considered to be significant, specialists' opinions are generally afforded more weight." Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998) (citing 20 C.F.R. § 404.1527(d)(5)). The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) (citation omitted). Thus, the ALJ properly determined that little weight should be given to Dr. Knapp's opinion to the extent it imposed mental restrictions upon Plaintiff.

Also, upon discrediting Dr. Knapp's opinion, the ALJ noted that Dr. Knapp did not specifically evaluate Plaintiff's ability to engage in any exertional or non-exertional work activities and did not refer to any specific objective findings or treatment notes to support his assessment of Plaintiff's capacity to work. See Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion). Cf. Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (upholding the ALJ's decision to discount the treating physician's medical-source

statement where limitations were never mentioned in numerous treatment records or supported by any explanation).

The ALJ further considered that, upon opining that Plaintiff's mental limitations precluded her from working, Dr. Knapp addressed the ultimate issue reserved for the Commissioner, see Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ need not defer to treating doctor's opinion that claimant is totally disabled "because it invades the province of the Commissioner to make the ultimate disability determination"); that Dr. Knapp did not reference specific finding or treatment notes supporting his conclusions, see Matthews, 879 F.2d at 424; 20 C.F.R. § 404.1527(d)(3); and that Dr. Knapp's opinion regarding Plaintiff's mental limitations was inconsistent with the objective findings from Plaintiff's mental health providers, as discussed above, see Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (ALJ may discount doctor's opinion when it is inconsistent with other evidence).

As for Plaintiff's argument that the ALJ did not consider many of the relevant factors for weighing medical opinions as set forth in the Regulations when determining the weight to be given Dr. Knapp's opinion, as discussed above in regard to Dr. Kamat's opinion, an ALJ is not required to explicitly discuss every factor mentioned in 20 C.F.R. §§ 404.1527(c)(2)-(5) and 416.927(c)(2)-(5), and

failure to discuss each factor does not mean the ALJ did not consider them. <u>See</u> <u>Molnar v. Colvin</u>, 2013 WL 3929645, at *2 (E.D. Mo. July 29, 2013).

To the extent the ALJ may have actually given great weight to Dr. Knapp's finding that Plaintiff's physical conditions did not prevent her from engaging in work-related activities and to the extent Plaintiff intended to challenge the ALJ's doing so, Dr. Knapp was Plaintiff's treating primary care doctor, and his opinion, therefore, was "inherently entitled" to controlling weight in the areas relevant to his treatment of Plaintiff. <u>Estes v. Barnhart</u>, 275 F.3d 722, 725 (8th Cir. 2002).

Further, the ALJ noted that Dr. Knapp did not consider Plaintiff's subsequent diagnosis of peripheral neuropathy or bilateral knee osteoarthritis, of which conditions the ALJ took account in formulating Plaintiff's RFC. (Tr. 431, 433). <u>See</u> <u>Wildman v. Astrue</u>, 596 F.3d 959, 967 (8th Cir. 2010) (ALJ properly discounted opinion of doctor who did not have access to all of the claimant's records). In any case, upon considering the weight to be given Dr. Knapp's opinion, the ALJ was fulfilling her role to evaluate the record as a whole. <u>See</u> <u>Hogan</u>, 239 F.3d at 961. As such, the court finds that the ALJ gave proper weight to Dr. Knapp's opinion and that the ALJ's decision, in this regard, is based on substantial evidence and is consistent with the Regulations and case law.

**D.    Opinion of Dr. Wessels:**

Plaintiff began treating with Dr. Wessels, for primary care, in August 2012, after discontinuing treatment with Dr. Knapp.  (Tr. 1310-31).  Dr. Wessels completed a Mental Medical Source Statement, dated March 1, 2013, in which she opined that Plaintiff had marked limitations in regard to her ability to cope with normal stress, maintain reliability, interact with strangers or the general public, accept instructions or respond to criticism, maintain attention and concentration for extended periods, perform at a consistent pace, and respond to changes in the work setting.  She also opined that Plaintiff could sustain regular work performance for up to two hours at a time and that she would be absent from work three or more times a week due to her mental impairments.  (Tr. 1245-47).  The ALJ stated that she gave little weight to Dr. Wessels' opinion as expressed on the Mental Medical Source Statement.  (Tr. 442).  Plaintiff argues that the ALJ erred in evaluating Dr. Wessels' opinion "just as [she] erred in evaluating" Dr. Kamat's opinion, and that the ALJ failed to evaluate the length of treatment, frequency of examination, and nature and extent of Dr. Wessels' relationship with Plaintiff.  (Doc. 25 at 20).

Upon determining the weight to be given Dr. Wessels' opinion regarding Plaintiff's mental limitations, the ALJ considered that the objective medical evidence, particularly from Plaintiff's psychiatric treatment notes and the findings of the psychiatric examiner, did not support the degree of limitation imposed by

Dr. Wessels. (Tr. 441-42). See Tilley, 580 F.3d at 679. The ALJ also considered that Dr. Wessels was a primary care physician and not a psychiatrist, and did not have the specialized knowledge upon which to draw when evaluating Plaintiff's mental impairments. (Tr. 442). See Qualls, 158 F.3d at 428; Kelley, 133 F.3d at 589. Additionally, the ALJ considered that Dr. Wessels had a "very limited treating relationship with [Plaintiff] with respect to her mental impairments," and did not begin to treat Plaintiff until August 2012, and so her opinion was "less probative with respect to [Plaintiff's] functioning limitations dating back to the alleged onset date of October 27, 2006." (Tr. 442). As such, the ALJ did consider the length and nature of Dr. Wessels' relationship with Plaintiff. Further, as stated above in regard to Dr. Kamat and Dr. Knapp, an ALJ is not required to explicitly discuss every factor mentioned in 20 C.F.R. §§ 404.1527(c)(2)-(5) and 416.927(c)(2)-(5), and failure to discuss each factor does not mean the ALJ did not consider them. See Molnar, 2013 WL 3929645, at *2.

Further, the court notes that the mental limitations which Dr. Wessels imposed on Plaintiff are contradicted, in part, by Dr. Wessels' own notes. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). In this regard, in August 2012, Dr. Wessels reported that Plaintiff was agitated, anxious, did not exhibit compulsive

behavior, behaved appropriately for her age, had normal knowledge and language, was not in denial, did not have flight of ideas, was not forgetful, denied hopelessness, had increased activity, had normal attention span and concentration, and did not have pressured speech. (Tr. 1242). Additionally, in September 2012, Dr. Wessels reported that Plaintiff was oriented, was not agitated or anxious, behaved appropriately, had normal knowledge and language, and did not have flight of ideas or pressured speech. (Tr. 1238). In October 2012, Dr. Wessels reported that Plaintiff was oriented and had appropriate mood and affect. (Tr. 1234). In December 2012, Dr. Wessels noted that Plaintiff was oriented, had appropriate mood and affect, but poor insight and judgment. (Tr. 1225). In any case, upon considering the weight to be given Dr. Knapp's opinion, the ALJ was fulfilling her role to evaluate the record as a whole. See Hogan, 239 F.3d at 961.

To the extent Plaintiff may have intended to challenge the extent to which the ALJ incorporated Dr. Wessels' physical findings in her RFC determination, Dr. Wessels reported, on Plaintiff's initial visit in August 2012, that Plaintiff's spine had no scoliosis and was negative for posterior tenderness; Plaintiff had "relatively normal flexion with mild pain" and grossly abnormal extension and rotation of the cervical spine with pain; her cervical spine was tender with moderate pain on motion; and her upper body examination had normal active flexion/extension, normal sensation, and no atrophy. (Tr. 1242). In September 2012, Dr. Wessels

ordered physical therapy for Plaintiff's back, and, in October 2012, Dr. Wessels reported, upon examination, that Plaintiff said she had some relief with a heating pad for her back. (Tr. 1238). Cf. Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006) (affirming ALJ's credibility determination based in part on claimant's doctors having recommended exercise and medication but never surgery). Also, in October 2012, Dr. Wessels reported that examination of Plaintiff's musculoskeletal system demonstrated that she had normal gait, normal posture, normal muscle tone in her lower extremities, and normal paraspinous tone. Plaintiff also had a normal sensory examination, and normal balance and coordination. (Tr. 1234). In December 2012, Dr. Wessels reported that Plaintiff had decreased active range of motion, "+4/5 grip, bicep[s], tricep[s] bilaterally," normal sensation, normal gait, limited cervical flexion and extension with pain, and normal lumbar flexion with discomfort upon extension. (Tr. 1225). Thus, the ALJ's determination that Plaintiff could perform medium work with the limitations that she avoid climbing and hazards was consistent with Dr. Wessels' physical findings. In conclusion, the court finds that the ALJ gave proper weight to Dr. Wessels' opinion and that the ALJ's decision, in this regard, is based on substantial evidence and consistent with the Regulations and case law.

**E.    Opinions of Stanley Hutson, Ph.D., and Kyle DeVore, Ph.D.:**

To the extent Plaintiff argues that the ALJ should not have relied on the opinions of Dr. Hutson and Dr. DeVore, the court notes that, without examining Plaintiff but after reviewing the record evidence, Dr. DeVore opined, on January 2009, that Plaintiff was moderately limited in many areas, but that she could ask simple questions, understand simple directions, follow and carry out simple instructions, and perform at least simple unskilled tasks.  (Tr. 380-81).  Dr. DeVore also opined that Plaintiff had mild restrictions in activities of daily living, and that Plaintiff was capable of performing simple work tasks.  (Tr. 369-79).

After reviewing the evidence of record, Dr. Hutson completed a Mental RFC Assessment for Plaintiff, and opined, on January 21, 2011, that Plaintiff was not significantly limited in regard to remembering locations and work-like procedures, understanding and remembering very short and simple instructions, carrying out very short and simple instructions, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, sustaining an ordinary routine without special supervision, and working in coordination or proximity to others.  He further opined that in all areas of social interaction Plaintiff was not significantly limited, with the exception that she was moderately limited in regard to getting along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Likewise, Plaintiff was not

significantly limited in regard to adaptation, with the exception that she was moderately limited in regard to the ability to respond appropriately to changes in the work setting. (Tr. 1729-31). After reviewing the evidence of record, Dr. Hutson opined, on a Psychiatric Review Technique form, that Plaintiff was moderately limited in activities of daily living and maintaining concentration, persistence or pace; that she was mildly limited in regard to social functioning; and that there was insufficient evidence that Plaintiff had repeated episodes of decompensation, each of an extended duration. Dr. Hutson pointed to specific evidence to support his conclusions, including test results reported by Dr. Leonberger, records of Dr. Kamat, hospital records, and Plaintiff's and her ex-husband's reports. (Tr. 1740-42).

The ALJ stated that she gave some weight to Dr. DeVore's and Dr. Hutson's opinions when formulating Plaintiff's RFC. Notably, the ALJ did not rely on the opinions of these doctors alone when determining the severity of Plaintiff's conditions and formulating Plaintiff's RFC; rather the ALJ considered the record as a whole, including those portions of Dr. Kamat's records which were consistent with the opinions of these non-examining sources. See Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (holding that the ALJ properly relied on non-examining doctor's opinion because part of the record provided substantial support for the weight given the opinon). Further, given Dr. Kamat's inconsistent

opinions, it was not improper for the ALJ to consider the opinions of Dr. DeVore and Dr. Hutson. <u>See</u> <u>Hacker v. Barnhart</u>, 459 F.3d 934, 937 (8th Cir. 2006) (allowing the ALJ to substitute opinions of non-treating physicians where a treating doctor rendered inconsistent opinions). Moreover, Dr. DeVore and Dr. Hutson are State agency psychological consultants and, as such, they are highly qualified experts in Social Security disability evaluation and ALJs properly may consider their findings as opinion evidence. <u>See</u> 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i). In any case, both Dr. DeVore and Dr. Hutson are psychologists and, therefore, are experts who were qualified to give opinions regarding Plaintiff's mental status. <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 886 (8th Cir. 2006) ("'[M]edical opinions' are defined as 'statements from physicians and psychologists or other acceptable medical sources.'") (quoting 20 C.F.R. § 404.1521(a)).

Finally, when considering the weight to be given the opinions of Dr. DeVore and Dr. Hutson, the ALJ considered the extent to which their opinions were consistent with and supported by the objective medical evidence of record. (Tr. 435). As such, the ALJ articulated her reasons for giving some weight to the opinions of these doctors. <u>See</u> <u>Ingram v. Chater</u>, 107 F.3d 598, 601 (8th Cir. 1997) (in determining the weight to be given to a state agency consultant's opinion, the ALJ "must minimally articulate his reasons for crediting or rejecting evidence of disability"). Just as with the opinions of other medical sources, the ALJ must

explain the weight given to the opinions of the state agency consultant, unless a treating source's opinion is given controlling weight. 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii). As such, the court finds that the ALJ gave proper weight to the opinions of Dr. DeVore and Dr. Hutson and that the ALJ's decision, in this regard, is based on substantial evidence and consistent with the Regulations and case law.

**F.  ALJ's RFC Determination:**

Citing <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000), Plaintiff contends that the ALJ's RFC determination is not supported by the evidence and that the ALJ should have obtained medical evidence that addressed Plaintiff's ability to function in the workplace. In <u>Nevland</u>, 204 F.3d at 858, the Eighth Circuit held that the ALJ relied on the opinions of non-treating, non-examining physicians when determining the claimant's RFC; that the ALJ did not satisfy his duty to fully and fairly develop the record; and that the ALJ should have either sought an opinion from the claimant's treating doctors or, in the alternative, ordered consultative examinations. The court finds Plaintiff's arguments based on <u>Nevland</u>, 204 F.3d 853, without merit for the following reasons.

First, as discussed above, the ALJ thoroughly considered the records of Plaintiff's treating doctors, including Dr. Kamat, Dr. Knapp, and Dr. Wessels, as well as the opinions of Dr. Leonberger, Dr. DeVore, and Dr. Hutson. The court

has found above that the ALJ gave proper weight to the opinions of these doctors and that the weight the ALJ gave to these doctors' opinions is based on substantial evidence. Second, unlike <u>Nevland</u>, the record in the matter under consideration is replete with *treatment notes* from Plaintiff's treating doctors, which notes are consistent with the ALJ's RFC determination. Third, as discussed above, the record includes support for the physical limitations imposed by the ALJ, as reflected in the ALJ's RFC determination. <u>See Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th Cir. 2001) ("'[s]ome medical evidence,' <u>Dykes v. Apfel</u>, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000)"). Fourth, unlike <u>Nevland</u>, the record in the matter under consideration includes a consultative examination, pursuant to which Dr. Leonberger conducted testing of Plaintiff.

Fifth, upon making Plaintiff's RFC assessment, as required by the Regulations and case law, the ALJ first identified Plaintiff's functional limitations and restrictions, and then assessed her work-related abilities on a function-by-function basis. <u>See Harris v. Barnhart</u>, 356 F.3d 926, 929 (8th Cir. 2004). The ALJ also assessed Plaintiff's credibility, as discussed above, and was only required to include her credible limitations. <u>See Tindell v. Barnhart</u>, 444 F.3d 1002, 1007

(8th Cir. 2006) ("The ALJ included all of Tindell's credible limitations in his RFC assessment, and the ALJ's conclusions are supported by substantial evidence in the record."). Pursuant to the Regulations, the ALJ found that Plaintiff's subjective complaints were not fully credible. The ALJ further found that Plaintiff's physical functional limitations prevented her from climbing and required that she avoid hazardous heights. Finally, the ALJ found that Plaintiff's mental functional limitations enabled her to understand, remember, and carry out *simple* instructions and non-detailed tasks.

The ALJ did not play doctor upon determining Plaintiff's RFC, as Plaintiff suggests, because upon determining Plaintiff's RFC, the ALJ was fulfilling her role to evaluate the record as a whole. (Doc. 25 at 17). See Eichelberger, 390 F.3d at 591. Indeed, the ALJ was not required to adopt the opinion of a single medical source, to rely entirely on a particular physician's opinion, or to choose between the opinions of the physicians of record. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011).

Finally, the ALJ's RFC determination, which limits Plaintiff to jobs which require no more than understanding, remembering, and carrying out simple instructions, is consistent with the opinions of Dr. Hutson, Dr. Leonberger, Dr. DeVore, with certain aspects of the Mental Medical Source Statements completed by Dr. Kamat, with Dr. Kamat's treatment notes, and with the observations of Dr.

Wessels regarding Plaintiff's mental status, all of which are discussed above. As for the ALJ's restricting Plaintiff's RFC in regard to her avoiding climbing and hazards, these limitations accommodated Plaintiff's complaints of pain to the extent the ALJ found such complaints credible and are consistent with the physical findings of Dr. Wessels, as discussed above. As such, the court finds that substantial evidence supports the ALJ's RFC determination, and that the ALJ's RFC determination is consistent with the Regulations and case law.

**G.    Hypothetical to the VE:**

As discussed above, the RFC which the ALJ assigned to Plaintiff provided that she could perform medium work, with limiting her to understanding, remembering, and carrying out simple instructions and non-detailed tasks and avoiding climbing and hazardous heights. Plaintiff argues that this RFC did not specifically use the phrase "unskilled work," and that the hypothetical which the ALJ posed to the VE was improper because the person described in the hypothetical posed to the VE described Plaintiff as being able to perform "unskilled work." (Doc. 25 at 20).

Indeed, the hypothetical which the ALJ posed to the VE described Plaintiff as being able to perform "unskilled work"; it did not specifically limit Plaintiff to understanding, remembering, and carrying out simple instructions and non-detailed tasks. (Tr. 483). The court finds, however, that Plaintiff's argument is without

merit because unskilled work is defined in the Regulations as "'need[ing] little or no judgment to do simple duties that can be learned on the job in a short period of time.'" Hulsey v. Astrue, 622 F.3d 917, 922-23 (8th Cir. 2010) (quoting 20 C.F.R. § 416.968(a)). See also 20 C.F.R. § 404.1568(a)). "Unskilled work is the 'least complex type[ ] of work.'" Id. at 923 (quoting SSR 82-41, 1982 WL 31389 (1982) (defining unskilled work as jobs that can usually be learned in 30 days or less)) (alteration in original). Thus, by its very definition, the RFC which the ALJ assigned to Plaintiff described a person who could perform unskilled work.

To the extent Plaintiff cites Seventh Circuit cases in support of her argument that unskilled work does not account for Plaintiff's moderate limitations in maintaining concentration, persistence, or pace (Doc. 35 at 10-11), there is Eighth Circuit precedent to the contrary which this court must follow. See Hood v. United States, 342 F.3d 861, 864 (8th Cir. 2003) (holding that a district court in the Eighth Circuit is bound to apply Eighth Circuit precedent); Faint v. Colvin, 26 F. Supp. 3d 896, 911-12 (E.D. Mo. 2014) (plaintiff's limitations in concentration, persistence, or pace did not impose limitations beyond the performance of simple, unskilled work); Powell v. Colvin, 14 WL 6886056, at *12 (E.D. Mo. Dec. 4, 2014) (rejecting application of Seventh Circuit authority and holding that the ALJ accounted for the claimant's moderate limitations in concentration, persistence, or pace by limiting claimant to performing simple, repetitive tasks). Moreover, the

Eighth Circuit has specifically held that "[w]hile the hypothetical question must set forth all [of] the claimant's impairments, it need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments." Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001) (internal quotation and citation omitted) (finding claimant capable of "simple work" adequately accounted for claimant's borderline intellectual functioning).

To the extent that Plaintiff argues that there is no evidence that her difficulties in concentration, persistence, or pace could be solved by limiting her to simple instructions and non-detailed tasks (Doc. 35 at 9), as discussed above, Dr. Hutson and Dr. DeVore specifically opined that Plaintiff could understand and remember simple instructions and perform *unskilled tasks*. (Tr. 317, 319, 380-81, 435-36, 1729-31, 1740-42).

To the extent Plaintiff argues that the ALJ erred in "conflating unskilled [] educational/work experience attribute of a claimant (skill level) into a consequence of medical impairments and an element of RFC" (Doc. 35 at 7-8), as noted by Defendant, this argument is simply without merit given that the Regulations state that unskilled work can be learned on the job in a short period of time. See 20 C.F.R. §§ 404.1568(a), 416.968(a).[14] Moreover, despite Plaintiff's assertion to the

---

[14] 20 C.F.R. § 404.1568(a) and § 416.968(a) both state:

contrary, the ALJ did not simply utilize the level of Plaintiff's prior jobs to determine her mental RFC. As discussed above, upon determining Plaintiff's mental RFC, the ALJ considered the record as a whole, including the objective findings of Plaintiff's mental-status examinations. Thus, in conclusion, the court finds that the hypothetical which the ALJ posed to the VE adequately incorporated the RFC which the ALJ assigned to Plaintiff and which RFC the court has found is based on substantial evidence.

In response to the ALJ's hypothetical, the VE testified that Plaintiff could perform her past relevant work as a wire worker, and that, alternatively, there were other jobs existing in significant numbers in the national economy, including fast-food worker, dishwasher, and cashier, which Plaintiff could perform; these additional jobs were in the light unskilled category. (Tr. 483-84). The VE further testified that the wire worker, fast-food worker, and dishwasher jobs which Plaintiff could perform required a reasoning level of "two," and that the cashier job required a reasoning level of "three." (Tr. 483-84). Based on the Dictionary of

_____

> Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and off bearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.

Occupational Titles (DOT), Plaintiff contends that the positions identified by the VE had broader demands than Plaintiff's RFC, and that there was a conflict between level two reasoning and the ALJ's RFC determination that Plaintiff could follow simple instructions and non-detailed tasks. (Doc. 20 at 21-22).

The DOT defines a reasoning level of two as follows: "Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." DOT (4th ed.), App. C, Components of the Definition Trailer, 1991 688702 (Jan. 1, 2008). The DOT defines a reasoning level of three as follows: "Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." Id.

Directly on point, is the Eighth Circuit's opinion, in Moore v. Astrue, 623 F.3d. 599, 604-605 (8th Cir. 2010). In Moore, 623 F.3d at 604, the ALJ submitted a hypothetical to the VE which described the claimant as being able to carry out simple job instructions and perform simple, routine and repetitive work activity at the unskilled task level. In response, the VE identified occupations that required level two reasoning according to the DOT, and the Eighth Circuit held that the ALJ did not err in relying upon the VE's expert testimony. Id. Specifically, the Eighth Circuit held:

The ALJ did not err in relying on the vocational expert's testimony. In the hypothetical, the ALJ did not limit "simple" job instructions to "simple one- or two-step instructions" or otherwise indicate that Moore could perform only occupations at a DOT Level 1 reasoning level. Indeed, the Level 2 reasoning definition refers to "detailed but *uninvolved*" instructions. DOT at 1011 (emphasis added). The dictionary defines "uninvolved" as "not involved," and in turn defines "involved" as "complicated, intricate." Webster's Third New Int'l Dictionary 1191, 2499 (2002). There is no direct conflict between "carrying out simple job instructions" for "simple, routine and repetitive work activity," as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate.

[T]he Level 2 reasoning definition is an upper limit across all jobs in the occupational category, not a requirement of every job within the category. "[A] claimant's reliance on the DOT as a definitive authority on job requirements is misplaced because DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." Page, 484 F.3d at 1045 (internal quotation marks omitted). "The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities." Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000); see DOT at xiii. "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." Wheeler, 224 F.3d at 897. There is nothing in the record to suggest that the vocational expert ignored the reasoning limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs. See Whitehouse v. Sullivan, 949 F.2d 1005, 1006 (8th Cir. 1991) ("[T]he ALJ could properly assume that the expert framed his answers based on the factors the ALJ told him to take into account."). Because substantial evidence supports the ALJ's phrasing of the hypothetical to the vocational expert, and there was no conflict between the vocational expert's testimony and the DOT, the ALJ properly relied on the testimony. See Page, 484 F.3d at 1045.

Notably, the VE in the matter under consideration testified that there was no conflict between the vocational evidence of record and the information in the DOT. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("Based on our previous conclusion . . . that 'the ALJ's findings of [the claimant's] RFC are supported by substantial evidence,' we hold that '[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.'") (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)); Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations). See also Miller v. Colvin, 2014 WL 7392154, at *5 (E.D. Mo. Dec. 29, 2014) (finding no conflict between the ALJ's RFC finding that the claimant could follow simple instructions and non-detailed tasks and various jobs requiring level-2 reasoning); Wilson v. Colvin, 2014 WL 4741091, at *9 (E.D. Mo. Sept. 23, 2014).

In any case, it is well established that reasoning levels of two and three are not inconsistent with unskilled work. See Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007) (a reasoning level of three was not inconsistent with unskilled work). See also Robinson v. Astrue, 2010 WL 481045, at *17–18 (E.D. Mo. Feb. 4, 2010) (reasoning levels of two and three are consistent with unskilled work and

ALJ's RFC limitations of following simple instructions and non-detailed tasks). Moreover, the "DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities." Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000). "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." Id.

Finally, there is nothing to suggest that the VE ignored the reasoning limitations of the DOT in determining that the person described in the hypothetical posed by the ALJ could perform the jobs of wire worker, dishwasher, and fast-food worker. In conclusion, the court finds that Plaintiff has not established that there is any conflict between the requirements of level two reasoning, or three for that matter, and that the ALJ's determination that Plaintiff could perform the jobs of fast-food worker and dishwasher is based on substantial evidence and consistent with the Regulations and case law. Because these jobs exist in significant numbers in the national economy, the court finally finds that the ALJ's ultimate determination that Plaintiff is not disabled within the meaning of the Act is based on substantial evidence. See Martise, 641 F.3d at 927.

As for the various Detailed Job Specialty Reports from SkillTRAN which Plaintiff addressed for the first time in her Reply brief (Doc. 35-2-4), the court first notes that "[a]s a general rule," arguments raised for the first time in a reply brief

are not considered by a court.  Barhan v. Reliance Standard Life Ins. Co., 441 F.3d 581, 584 (8th Cir. 2006).  Further, this evidence is not relevant to the extent it contains information included in the DOT.  See Martise, 641 F.3d at 927. Moreover, "[w]hen expert testimony conflicts with the DOT, and the DOT classifications are not rebutted, the DOT controls."  Porch v. Chater, 115 F.3d 567, 572 (8th Cir. 1997).  Notably, the ALJ in the matter under consideration determined that the VE's testimony did not contradict the DOT (Tr. 448), and Plaintiff does not cite any such conflict(s).  As such, the court finds that the ALJ properly relied on the VE's testimony that, in addition to Plaintiff's past relevant work, there was work, available in significant numbers in the national economy, which Plaintiff could perform, and that, therefore, the ALJ's ultimate conclusion that Plaintiff was not disabled is based on substantial evidence and consistent with the Regulations and case law.

## IV.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Complaint, Brief in Support of Complaint, and Reply (Docs. 1, 20, 35) is **DENIED**; and

**IT IS ORDERED** that a separate judgment be entered incorporating this Memorandum and Order.


Dated this 25th day of September 2015.

/s/ Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE